On February 27th, 1936, Leon Najdrowski died in the city of Jersey City, county of Hudson. He left him surviving, a sister of the whole blood, Apolonja Jankowska, who resides in Poland; a half-brother, the defendant Joseph Najdrowski, who resides in Jersey City; a half-sister, Frances Speed, who resides in Elmsford, New York; and a half-sister, the complainant Lydia Cutts, who resides in Tabernacle, New Jersey.
The decedent in his lifetime opened a bank account in his own name in the Williamsburgh Savings Bank in the city of New York. There was on deposit in the account the sum of $6,155.96. On July 16th, 1932, he had the account changed to read "Leon Najdrowski Int. for Joseph Najdrowski." *Page 547 
Joseph Najdrowski named in that account is the defendant. On March 5th, 1936, after the death of Leon, Joseph, the defendant, withdrew the balance of $6,148.34, then remaining in the account; out of that sum he paid the funeral expenses of Leon. On the same day, March 5th, 1936, he deposited from the amount withdrawn, the sum of $5,500 in a joint account with his wife, Augusta Najdrowski, the defendant, in the Fifth Ward Savings Bank of Jersey City.
The complainant Lydia Cutts was subsequently appointed administratrix of Leon's estate. The bill filed by her seeks an accounting, and the imposition of a trust on the funds in the bank account of Joseph and Augusta Najdrowski in the Fifth Ward Savings Bank of Jersey City.
The complainant contends that, at the time the account was changed in the Williamsburgh Bank, both Leon and Joseph resided in the city of Jersey City, and, since the situs of an intervivos trust of personalty is in the domicile of the creator, the law of New Jersey governs and decides the title to the funds. This contention is disputed by the defendants. They say that the situation in the instant case is within, and controlled by, the principle laid down in Matter of Toten, 179 N.Y. 112;71 N.E. Rep. 748, which, inter alia, is as follows:
"A deposit by one person of his money in his own name as trustee for another, standing alone, does not establish an irrevocable trust during the lifetime of the depositor. It is a tentative trust merely, revocable at will, until the depositor dies or completes the gift in his lifetime by some unequivocal act or declaration such as delivery of the pass book or written notice to the beneficiary. In case the depositor dies * * * the presumption arises that an absolute trust was created as to the balance on hand * * *."
The complainant directs attention to the case of Swetland v.Swetland, 105 N.J. Eq. 608; affirmed, 107 N.J. Eq. 504, in which Vice-Chancellor Berry, inter alia, said:
"It is contended that the rule as to testamentary trusts has no application to trusts created inter vivos. The reason for the rule with respect to testamentary trusts is based upon the *Page 548 
fact that personal property has its situs at the domicile of the owner. Mobilia sequuntur personam. And a testamentary disposition of personalty must be in accordance with the laws of testator's residence and domicile at the time the will becomes effective. Murphy v. Morrisey Walker, 99 N.J. Eq. 238. The same reasoning which results in that rule suggests that the validity and situs of trusts inter vivos are determined by the law of the domicile of the settlor or creator at the date of the execution of the trust instrument.
"* * * But the safer rule, it seems to me, is to hold that thesitus of an inter vivos trust of personalty is at the domicile of the creator because `mobilia sequuntur personam.'
By the application of this rule there seldom can be any difficulty of construction or conflict of authority."
The Swetland Case, in some respects, seems to be in conflict with the opinion rendered by Vice-Chancellor Stevens in Fiocchi
v. Smith, 97 Atl. Rep. 283, and the opinion of Vice-Chancellor Fallon expressed in Hudson Trust Co. v. Holt, 115 N.J. Eq. 34.
It is my belief that the law of the domicile controls in this case — the Jersey City residence of the late Leon, and of the defendant Joseph.
A witness for the complainant, Mrs. Adamkiewicz, said that on the day of Leon's death, she and Joseph were in Leon's apartment, and Joseph made a search in the apartment for the bank book, and found it in Leon's trunk, from which he took it and placed it in his pocket.
It appears that Leon lived alone in an apartment rented to him by Mrs. Adamkiewicz; he lived amid squalid surroundings. He failed to provide himself with the ordinary necessities of life. He purchased articles of food that were cheap and of an inferior quality. He bought sour milk which he sweetened with sugar. He lived in a miserly way. Though he had been in poor health for quite a period, his death was sudden and unexpected. His dead body was discovered in an upright position in a chair in his apartment. Joseph was summoned and when he arrived at Leon's apartment after the death of Leon, Mrs. Adamkiewicz, then and there present, *Page 549 
suggested that the police be notified. That was done. Police Officer Lazarus appeared in response to the notification. He testified for the complainant. He said that Joseph admitted to him that he found Leon's bank book in Leon's trunk in the apartment on the day of Leon's death.
Shortly before Joseph's name had been added to the account in the Williamsburgh Bank, in the year 1932, Leon had been ill. At that time a conversation took place between them, in the course of which, Joseph told Leon, "if something happens to you, I will not bury you." When Leon recovered from that illness, the account in the Williamsburgh Bank was changed to both names. Joseph admitted that the change of names in the account, took place after Leon's illness in 1932. There was also testimony on the part of witnesses for the complainant, who are disinterested, that Leon said "Joseph would divide the money between all sisters and brothers;" and that "Joe will take care of it and divide the money."
Joseph, in the course of his testimony, said that the decedent had left the bank book with him for safe keeping; that he was to get "what was left when Leon died." That statement would indicate that the gift was testamentary and since it failed to comply with the statute of wills, it is void. Nicklas v. Parker, 69 N.J. Eq. 743;affirmed, 71 N.J. Eq. 777; Travers v. Reid, 119 N.J. Eq. 416.
Joseph's own testimony has the effect of destroying his contention that it is a gift inter vivos, because his statement clearly indicates that the gift was not to be presently effective. Thatcher v. Trenton Trust Co., 119 N.J. Eq. 408.
In that case, the court said:
"There is in the instant case no evidence of any such unequivocal act or declaration; no additional facts whatever, beyond the mere opening of the account in that way, in anywise tending to prove the declaration of a trust. The fact that decedent `transmitted knowledge of these accounts' to complainant does not so tend; it is quite barren of evidential force one way or another as to decedent's intent. On the other hand, the fact that she made withdrawals from these accounts, from time to time — (presumably for her own use *Page 550 
and benefit, since there is nothing to show otherwise) — is evidence tending to indicate that she had not intended to establish a presently effective trust."
The defendant relies, to some extent, upon the law enunciated in the case of Hudson Trust Co. v. Holt, supra. I do not concede that the principles there expressed can overcome the opinion of the court of errors and appeals in sustaining the observations of Vice-Chancellor Berry as stated in Swetland v.Swetland, supra. As to testamentary trusts, personal property has its situs at the domicile of the owner; and "the situs of an inter vivos trust of personalty is at the domicile of the creator because `mobilia sequuntur personam.'"
The application of the law expressed in Hudson Trust Co. v.Holt, supra, and Fiocchi v. Smith, supra, is questioned by the court in Hasbrouck v. Thayer-Martin, 120 N.J. Eq. 96, in which the court said:
"What was the nature and operation of the trusts created? The answer to this question depends somewhat on whether the law of this state or the law of New York (Tax Law — Consol. Laws ch. 60§§ 220 et seq.) controls. It was held in the chancery suit that the law of New York controls. The correctness of this holding seems at least open to doubt, inasmuch as the appellate courts both in New Jersey have affirmed the principle that the situs
of a trust of personalty created inter vivos is in the state of the domicile of the donor and the law of that state determines the validity of the trust. Swetland v. Swetland, 105 N.J. Eq. 608; affirmed, 107 N.J. Eq. 504; Second National Bank ofPaterson v. Curie, 116 N.J. Eq. 101."
It cannot be assumed, nor presumed, that the decedent gave the proceeds of the bank account to his brother, Joseph. The burden rests upon Joseph to establish by convincing evidence that it is a gift. His evidence, measured by New Jersey standards, supported by innumerable decisions, shows that he has failed to do so.Madison Trust Co. v. Allen, 105 N.J. Eq. 230; Reeves v.Reeves, 102 N.J. Eq. 436; In re Coyle, 9 N.J. Mis. R. 158;154 Atl. Rep. 744; Stines v. Carton, 98 N.J. Eq. 415. *Page 551 
"The mere opening of an account by decedent, in his name `in trust for Margaret Specht' is not sufficient, without more, to establish the declaration of a presently effective trust. `There must be some unequivocal act or declaration clearly showing that an absolute gift or trust was intended.'" Thatcher v. TrentonTrust Co., supra. In the instant case I find "no evidence of any such unequivocal act or declaration; no additional facts whatever, beyond the mere opening of the account in that way, in anywise tending to prove the declaration of a trust."
I am not persuaded by the testimony of Joseph that he kept the bank book in his home, and that when Leon wanted to withdraw money from the account, he would walk from his home to Joseph's home, some distance away, and ask for the book. That story does not ring true, when you visualize Leon's condition — enfeebled by sickness; his parsimonious conduct, and love of money indicated by his acts of economy and sparing expenditures; the search by Joseph for the bank book in Leon's apartment; the declarations of Leon that Joseph would divide the fund among the brothers and sisters; and all the other facts and circumstances in the case.
I shall advise an order as prayed for in the bill.